# United States Court of Appeals
## For the First Circuit

No. 20-1431

NCTA -- THE INTERNET & TELEVISION ASSOCIATION,

Plaintiff, Appellant,

v.

AARON M. FREY, in his official capacity as
Attorney General of the State of Maine,

Defendant, Appellee,

TOWN OF FREEPORT, MAINE; TOWN OF NORTH YARMOUTH, MAINE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch and Barron, Circuit Judges,
and Burroughs, District Judge.*

Jessica Ring Amunson, with whom Howard J. Symons, Elizabeth
B. Deutsch, Joshua D. Dunlap, Jenner & Block LLP, and Pierce Atwood
LLP were on brief, for appellant.
Christopher C. Taub, Deputy Attorney General, with whom Aaron
M. Frey, Attorney General, was on brief, for appellee.
John Bergmayer and Sara Nolan Collins on brief for Public

---

* Of the District of Massachusetts, sitting by designation.

Knowledge, amicus curiae.

James N. Horwood, Tillman L. Lay, Jeffrey M. Bayne, and Spiegel & McDiarmid LLP on brief for the Community Television Association of Maine, Alliance for Community Media, and Alliance for Communications Democracy, amici curiae.

---

August 3, 2021

---

**BARRON**, <u>Circuit Judge</u>.    NCTA -- The Internet and Television Association ("NCTA") appeals from the denial of its request for declaratory and permanent injunctive relief from certain provisions of a Maine state law, "An Act to Ensure Nondiscriminatory Treatment of Public, Educational and Governmental Access Channels by Cable System Operators" ("the Maine Act").   The provisions in question concern both the way that cable system operators must treat channels that qualify as local public, educational, and governmental access channels, or, as they are better known in the world of cable regulation, "PEG" channels, and the obligations of such operators to make cable service available in rural parts of the state.   Before the District Court, NCTA argued, among other things, that federal law facially preempts the provisions of the Maine Act at issue.   The District Court rejected that contention and denied any relief on that basis.   We affirm.

## I.

## A.

NCTA is a trade association for the cable television industry in the United States.   <u>NCTA -- The Internet & Television Ass'n</u> v. <u>Frey</u>, 451 F. Supp. 3d 123, 129 (D. Me. 2020).   Its members include operators of cable systems throughout the country, including in Maine.   <u>Id.</u> at 129 & n.1.

- 3 -

In general, cable system operators must obtain "permission" from local governments "to install cables under city streets and to use public rights-of-way." Denver Area Educ. Telecomms. Consortium v. FCC, 518 U.S. 727, 734 (1996) (plurality opinion). To do so, a cable system operator usually must first obtain a "franchise" from a "franchising authority" -- the state or local governmental entity that authorizes the construction of a new cable system or the operation of an existing one through a franchise agreement. 47 U.S.C. §§ 541(b)(1), 522(9)-(10).

Under Maine law, municipalities in the state serve as franchising authorities. See Me. Rev. Stat. Ann. tit. 30-A, § 3008. Accordingly, an individual municipality in the state may enter into a franchise agreement with a cable system operator that authorizes the franchisee to operate a cable system in that locality. See id.

NCTA's members have 307 franchises in Maine, each with its own franchise agreement. The terms of a franchise in Maine are generally in place for between ten and fifteen years, at which point the franchising authority and the franchisee may negotiate a renewal of the franchise.

NCTA member Charter has negotiated more than eighty franchise renewals in Maine in the past two years. At the time of the filing of this suit, it was involved in renewal negotiations with over fifty franchising authorities throughout the state.

In addition to the terms of the franchise agreement, a cable system operator in Maine may be subject to requirements that the State has imposed by statute. See, e.g., Me. Rev. Stat. Ann. tit. 30-A, § 3008(3), (5). For example, a Maine statute provides that "a cable system operator may not abandon service or a portion of that service without having given 6 months' prior written notice to the franchising municipality." Id. § 3008(3)(B). The state statutes may themselves establish the terms of the franchise agreements, as a separate Maine statute does in requiring that all franchise agreements in Maine must include "provision for access to, and facilities to make use of, one or more" channels that qualify as PEG channels. Id. § 3010(5).

There is a long history of states and local governments protecting PEG channels. The first cable systems were established in the United States in the 1940s and 1950s, see Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 627 (1994); United States v. Sw. Cable Co., 392 U.S. 157, 162 & n.12 (1968), and by the 1970s, it was common for local governments to require an operator to set aside capacity for PEG channel use as one of the terms of a franchise, Denver Area, 518 U.S. at 734 (plurality opinion); Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1926 (2019).

In 1984, when Congress amended the Communications Act of 1934 in order to account for the development of the cable

television industry, it codified local entities' ability to require operators to provide PEG channel capacity in exchange for granting a franchise. See 47 U.S.C. § 531(b); H.R. Rep. No. 98-934, at 19, 30 (1984), as reprinted in 1984 U.S.C.C.A.N. 4655, 4656, 4667. The House Report that accompanied the bill described these PEG channels as "the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet" because "they provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information." H.R. Rep. No. 98-934, at 30. The grant of authority to localities to require PEG channels was a key part of Congress's broader effort in the 1984 Act "to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas." Id. at 19.

In 2019, the Maine Legislature enacted the Maine Act, which amended the state statutes that regulate the provision of cable service in the state. See An Act to Ensure Nondiscriminatory Treatment of Public, Educational and Governmental Access Channels by Cable System Operators, 2019 Me. Laws 469 (codified at Me. Rev. Stat. Ann. tit. 30-A, §§ 3008(5), (7), 3010(5A), (5B), (5C)); see also NCTA, 451 F. Supp. 3d at 129. A major focus of that legislation -- as its name suggests -- was the treatment by cable system operators of PEG channels in Maine, given concerns about

certain practices by cable system operators regarding those channels. NCTA, 451 F. Supp. 3d at 131.

Specifically, cable system operators had begun moving PEG channels from low-numbered stations, where they had long been located, to the 1300 channel block. Id. The operators also transmitted PEG content in standard definition ("SD") only, notwithstanding the fact that PEG stations produced content in high definition ("HD"). Id. In addition, cable system operators listed PEG channels only as "LOCAL" on their electronic program guides. Id.

Four of the provisions of the Maine Act that took aim at these practices are at issue in this appeal. These four measures are:

"The Basic Tier Provision," which provides that:

A cable system operator shall carry public, educational and governmental access channels on the cable system operator's basic cable or video service offerings or tiers.

Me. Rev. Stat. Ann. tit. 30-A, § 3010(5-A); "The Channel Placement Provision," which provides that:

A cable system operator may not separate public, educational and governmental access channels numerically from other local broadcast channels carried on the cable system operator's basic cable or video service offerings or tiers . . . . A cable system operator shall restore a public, educational or governmental access channel that has been moved without the consent of the originator within the 24 months preceding the effective

- 7 -

date of this subsection to its original location and channel number within 60 days after the effective date of this subsection.

Id.; "The HD Provision," which provides that:

A cable system operator shall retransmit public, educational and governmental access channel signals in the format in which they are received from the originator and at the same signal quality as that provided to all subscribers of the cable television service for local broadcast channels. A cable system operator may not diminish, down convert or otherwise tamper with the signal quality or format provided by the originator. A cable system operator shall deliver a public, educational or governmental access channel signal to the subscriber in a quality and format equivalent to the quality and format of local broadcast channel signals carried on the cable television service if provided as such by the originator. A cable system operator shall carry each public, educational or governmental access channel in both a high definition format and a standard digital format in the same manner as that in which local broadcast channels are provided, unless prohibited by federal law.

Id. § 3010(5-B); and "The Electronic Program Guide Provision,"

which provides that:

A cable system operator, when requested, shall assist in providing the originator with access to the entity that controls the cable television service's electronic program guide so that subscribers may view, select and record public, educational and governmental access channels in the same manner as that in which they view, select and record local broadcast channels. In addition, a cable system operator shall identify public, educational and governmental access channels on the electronic program guide in the same manner as that in which local broadcast

channels are identified. This subsection does not obligate a cable system operator to list public, educational and governmental access channel content on channel cards and channel listings. If channels are selected by a viewer through a menu system, the cable system operator shall display the public, educational and governmental access channels' designations in a similar manner as that in which local broadcast channel designations are displayed.

Id.

A fifth provision of the Maine Act is also at issue in this appeal, although it does not concern PEG channels. It instead addresses the provision of cable services in rural areas in the state. We will refer to it as "The Line Extension Provision." It requires each franchising authority in Maine to include in any franchise agreement "[a] line extension policy, which must specify a minimum density requirement of no more than 15 residences per linear strand mile of aerial cable for areas in which the cable system operator will make cable television service available to every residence." Id. § 3008(5)(B).

**B.**

On September 12, 2019, NCTA filed a complaint in the U.S. District Court for the District of Maine against Maine Attorney General Aaron Frey.[1] The complaint alleges that the five

---

[1] The towns of Freeport, Maine, and North Yarmouth, Maine, were also named as defendants below, but NCTA voluntarily dismissed those claims and the towns are not parties to this appeal.

provisions of the Maine Act just described violate federal law. As relevant here,[2] NCTA contends in the complaint that those five provisions are facially unconstitutional under the Supremacy Clause of the U.S. Constitution because they are facially preempted by provisions of federal law that govern cable communications, 47 U.S.C. §§ 521-573 ("the Cable Act").[3]  See NCTA, 451 F. Supp. 3d at 129.

NCTA moved for a preliminary injunction, but the District Court consolidated the motion with the trial on the merits.  See id. at 129 n.3.  The District Court then concluded that NCTA had failed to show that any of the five challenged provisions was facially preempted.  Id. at 129.

The District Court began by upholding the Line Extension Provision against NCTA's contention that it was facially preempted by the interaction of two provisions of the Cable Act.  Id. at 134-37.  The first concerns the Cable Act's preemptive effect and

---

[2] NCTA has not appealed the District Court's denial of its claim that the PEG provisions violate the First Amendment rights of its member cable operators.  See NCTA, 451 F. Supp. 3d at 146-50.

[3] The provisions codified at 47 U.S.C. §§ 521-573 were first enacted in the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779.  They have since undergone significant amendment in 1992, see Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460, and in 1996, see Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56.  Throughout this opinion, we refer to the provisions of federal cable law by referencing their section numbers in the U.S. Code.

is set forth in 47 U.S.C. § 556(c). It states that "any provision of law of any State . . . which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c). The second concerns the franchise renewal process and is set forth in § 546 of the Cable Act. It permits a franchising authority to reject a cable system operator's proposal for franchise renewal based only on one or more of four expressly enumerated considerations, which include whether "the operator's proposal is reasonable to meet the future cable-related community needs and interests, taking into account the cost of meeting such needs and interests." Id. § 546(c)(1)(D).

NCTA argued before the District Court that the Line Extension Provision is "inconsistent with," id. § 556(c), the portion of § 546 that directs a franchising authority to "tak[e] into account . . . cost[s]" in connection with the franchise renewal process. In rejecting that contention, the District Court explained that "[t]he problem with [NCTA's] argument is that it assumes that the State is making the final line extension decision for franchising authorities." NCTA, 451 F. Supp. 3d at 136. The District Court further explained that "the Maine Legislature" in passing the Maine Act was "not renewing franchise agreements" and "not acting as the franchising authority." Id. Accordingly, the District Court reasoned, the Maine Legislature was not required to comply with the "factfinding" requirements of § 546, which the

District Court concluded apply only to franchising authorities in administrative renewal proceedings.  Id.

The District Court separately explained that a plaintiff bringing a facial challenge based on preemption to a provision must show that "no set of circumstances exists under which" the challenged provision would be constitutionally valid.  Id. at 134 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).  The District Court then concluded that "[i]t makes more sense to allow cable operators to challenge the [Line Extension Provision] on a case by case basis, where a factual record can be developed to show whether a line extension term required by a particular franchising authority is reasonable to meet the community's needs in light of the costs."  Id. at 137.  The District Court acknowledged that NCTA had submitted some evidence that the costs of complying with the Line Extension Provision would be significant for individual franchisees operating in some municipalities.  Id. at 136.  But, it noted, other evidence in the record suggested that franchisees in other municipalities "might not be affected at all."  Id.  The District Court explained, for example, that Maine had "proffered at oral argument that there are already communities that use the 15 homes per linear mile standard" that the Line Extension Provision imposes.  Id. at 136 n.7.

Having rejected NCTA's preemption claim as to the Line Extension Provision on the grounds just described, see id. at 137,

the District Court then addressed NCTA's preemption claims regarding the four challenged provisions in the Maine Act that concern PEG channels, see id. at 137-46.  The District Court began its assessment of each of the four PEG provisions by addressing whether it is a "consumer protection law" within the meaning of § 552(d)(1) of the Cable Act.  See id. at 140, 142, 145.

That determination is potentially important to the preemption analysis.  Section 552(d)(1) states that "[n]othing in this subchapter shall be construed to prohibit any State . . . from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter."  47 U.S.C. § 552(d)(1).  Thus, if any of the four PEG provisions is a "consumer protection law" under § 552(d)(1), it is preempted only if a provision of the "subchapter" at issue "specifically preempt[s]" it, id., and not merely if it is "inconsistent with" a provision in the larger chapter, id. § 556(c).

The District Court held that each of the four PEG provisions at issue is a "consumer protection law" within the meaning of § 552(d)(1) of the Cable Act.  NCTA, 451 F. Supp. 3d at 140, 142, 145.  It then held that none of the provisions is "specifically preempted" by the subchapter referenced in § 552(d)(1), which consists of the provisions that we refer to as the Cable Act, for reasons that we will address in the course of the analysis that follows.  See id. at 142, 145-46.

- 13 -

The District Court accordingly denied NCTA's claims for declaratory and permanent injunctive relief for the four PEG provisions too.  Id. at 146.  The District Court's order entered on March 11, 2020.  Id. at 123.  NCTA filed a timely notice of appeal on April 10, 2020.  See Fed. R. App. P. 4(a)(1)(A).  We have jurisdiction under 28 U.S.C. § 1291.

**II.**

We begin with NCTA's challenge to the District Court's rejection of its claim of facial preemption against the Line Extension Provision.  NCTA bases this claim, as it did below, on the contention that, under § 556(c) of the Cable Act, this state-law measure is "inconsistent with" § 546 of that same federal statute.  See 47 U.S.C. § 556(c).  Our review is de novo.  See Bower v. Egyptair Airlines Co., 731 F.3d 85, 92 (1st Cir. 2013).

Section 546 of the Cable Act provides that where a franchising authority determines preliminarily that a cable system operator's franchise should not be renewed, it "shall . . . , at the request of the operator or on its own initiative, commence an administrative proceeding" to consider whether:

> (A) the cable operator has substantially complied with the material terms of the existing franchise and with applicable law;
>
> (B) the quality of the operator's service, including signal quality, response to consumer complaints, and billing practices, but without regard to the mix or quality of cable services or other services provided over the system,

- 14 -

has been reasonable in light of community needs;

(C) the operator has the financial, legal, and technical ability to provide the services, facilities, and equipment as set forth in the operator's proposal; and

(D) the operator's proposal is reasonable to meet the future cable-related community needs and interests, taking into account the cost of meeting such needs and interests.

47 U.S.C. § 546(c)(1).

Section 546 further states that a franchising authority may deny a cable system operator's proposal for renewal of the franchise only "based on one or more adverse findings made with respect to the factors" just described. Id. § 546(d). It also permits a cable system operator to obtain judicial review of the denial of a proposal for renewal by the franchising authority or of a failure by the franchising authority to comply with the procedural requirements set forth in that section by filing an action in "the district court of the United States for any judicial district in which the cable system is located." Id. § 555(a)(1); see also id. § 546(e)(1).

NCTA contends that § 546 facially preempts the Line Extension Provision because the latter measure imposes a "one-size-fits-all" requirement to build out cable systems and thus fails to account for whether the costs of compliance with that requirement for any cable system operator would be reasonable within the meaning of § 546(c)(1)(D) of the Cable Act. In

- 15 -

consequence, NCTA argues, the Line Extension Provision is "inconsistent with," id. § 556(c), at least that portion of § 546 of the Cable Act.

We are not persuaded. Section 546 does not purport, either in whole or in part, to limit the types of requirements (insofar as they do not concern the franchise renewal process itself) that may be demanded of cable system operators in the first instance, whether by franchising authorities setting the terms of franchise agreements or by states acting legislatively. Section 546 governs only the process by which a cable system operator's proposal for the renewal of its franchise may be denied.

Indeed, § 546 explicitly contemplates that denials of proposals for franchise renewals are distinct from efforts to impose and enforce substantive requirements on cable system operators. It provides that a franchising authority may deny a renewal proposal if it finds that the operator has not "substantially complied with the material terms of the existing franchise and with applicable law." See id. § 546(c)(1)(A) (emphases added); see also id. § 546(d).

We recognize that a franchising authority's decision to deny a cable system operator's proposal for renewal based on the operator's failure to comply with a specific state-law requirement, such as the one imposed by the Line Extension Provision, could run afoul of § 546(d) in a particular case. For

example, the franchising authority in deciding to deny the renewal proposal might not properly account for the costs of compliance with a state statutory requirement like the one imposed by the Line Extension Provision.

But, in imposing that state-law requirement, the state would have merely established the "law" that would be "applicable" in the renewal process that § 546 sets forth. See id. § 546(c)(1)(A). It would not have altered or even attempted to alter the process set forth in § 546 for evaluating franchise renewal proposals in light of "applicable law." In that respect, the state in imposing the state-law requirement would no more be acting "inconsistent with" § 546 than the franchising authority itself would be in imposing a term of that agreement in the first instance.

We thus agree with the District Court that § 546 governs only the "negotiati[on] [of] the renewal of . . . franchise agreements" and that Maine by enacting the Line Extension Provision is "not denying the renewal of a franchise." NCTA, 451 F. Supp. 3d at 136. And, because we do, we also agree with the District Court that NCTA's claim that the Line Extension Provision is facially preempted by § 546 of the Cable Act is without merit.[4]

---

[4] We note that NCTA's challenge to the Line Extension Provision is ripe, even though the parties agree that it applies only to future franchises or upon franchise renewal. At least

- 17 -

We now turn to NCTA's claims of facial preemption regarding the four PEG provisions mentioned above. We start by focusing on the subset of those claims of preemption in which NCTA contends that a particular one of the four PEG provisions at issue here -- and only that PEG provision -- is preempted by a certain provision of the Cable Act, or by certain discrete provisions of the Cable Act operating together. Our review in each instance is de novo. See Bower, 731 F.3d at 92.[5]

_____

some of NCTA's members' franchises are up for renewal now, which means that, under the terms of the Maine Act, the franchising authorities at the other side of the bargaining table from those members are required to demand that any renewed franchise include a compliant line-extension policy. Thus, even though the Line Extension Provision does not by its own force require the denial of any renewal proposal, that newly introduced background requirement does influence the balance of power between the parties in that respect. Cf. Clinton v. City of New York, 524 U.S. 417, 432-33 (1998) ("By depriving them of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents. . . . 'The Court routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III "injury-in-fact" requirement] . . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test.'" (second, third, fourth, fifth, and sixth alterations in original) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed. 1994))).

[5] NCTA's challenge to the PEG provisions is likewise ripe. Unlike the Line Extension Provision, which applies to future franchises and franchise renewals only, the PEG provisions apply even to operators that have agreements in place. See Me. Rev. Stat. Ann. tit. 30-A, § 3010(5-A), (5-B). And, the existing franchise agreements between NCTA members and franchising

**A.**

First up is NCTA's claim of preemption concerning the Basic Tier Provision. NCTA contends that the two provisions of the Cable Act that facially preempt this PEG provision in the Maine Act are § 543(a)(2) and § 543(b)(7). We do not agree.

NCTA's argument is somewhat involved. It depends in part on § 543(a)(2) of the Cable Act, which provides that, as to cable systems that are "subject to effective competition," the "rates for the provision of cable service by such system shall not be subject to regulation" by the Federal Communications Commission ("FCC") or a state or franchising authority, save for an exception that is set forth in § 532. See 47 U.S.C. §§ 543(a)(1)-(2), 532. It depends as well on the portion of that subsection of § 543 that further provides that, as to cable systems that are "not subject to effective competition," the "regulation" of "the rates for the provision of cable service" is permitted only as provided for elsewhere in § 543 itself. Id. § 543(a)(2). In addition, NCTA's

authorities do not currently impose the PEG provisions that NCTA challenges on operators. As a result, operators today are at risk of civil enforcement actions for failure to comply with the PEG provisions, see id. § 3010(7); Me. Rev. Stat. Ann. tit. 5, § 209, and the record "ma[kes] clear that [the Attorney General] would seek to enforce the challenged portions of the" Maine Act, Morales v. Trans World Airlines, Inc., 504 U.S. 375, 381 (1992); see also Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 90 (1st Cir. 2013) ("There is no doubt that the [defendant] intends to enforce the Ordinance against [the plaintiff] . . . ."). We thus conclude these portions of NCTA's challenge, too, are ripe.

argument depends on both § 543(b)(1), which provides that the FCC "shall, by regulation, ensure that the rates for the basic service tier are reasonable" in such cable systems; and § 543(b)(7), which states in part that the "basic service tier shall, at a minimum, consist of the following" and lists as one of the components of that tier "[a]ny [PEG] access programming required by the franchise of the cable system to be provided to subscribers," id. § 543(b)(7)(A)(ii).

According to NCTA, when these provisions are considered in combination, it is clear that they together provide that "where a cable system is subject to effective competition, neither the FCC, nor a state, nor a franchising authority may demand basic-tier PEG carriage because such mandated carriage is part of rate regulation." The assertion appears to depend on the following chain of logic: (1) § 543(a)(2) prohibits the "regulation" of "the rates for the provision of cable service" in systems that, like those in Maine, are subject to effective competition (subject to exceptions not relevant here); (2) Congress plainly considers, given § 543(b)(1) and § 543's general structure, the mandate to carry PEG channels on the basic tier described in § 543(b)(7)(A)(ii) to be a "regulation" of "the rate[] for the provision of cable service" within the meaning of § 543(a)(2); (3) the mandate to carry PEG channels on the basic tier described in § 543(b)(7)(A)(ii) is essentially identical to the mandate to

- 20 -

carry such channels that the Basic Tier Provision imposes; (4) hence, the application of the Basic Tier Provision's mandate to cable systems in Maine is barred by § 543(a)(2), because such cable systems are subject to effective competition and so, per that provision of § 543, are not subject to rate regulation.

In rejecting this argument, the District Court held that the Basic Tier Provision is a "consumer protection law" and so could be preempted only under the heightened "specifically preempted" standard. NCTA, 451 F. Supp. 3d at 140-41. The District Court then held that § 543 does not "'specifically preempt[]' the State from requiring PEG channels to be carried on the basic tier," id. at 141 (alteration in original) (quoting 47 U.S.C. § 552(d)(1)), because, although § 543 "require[s] that cable systems not subject to effective competition must include PEG channels on the basic tier," the existence of that requirement "says nothing about whether states may require cable operators subject to effective competition [like those in Maine] to carry PEG channels on the basic tier," id.

NCTA contends that the District Court was wrong to so conclude, even if the Basic Tier Provision is a "consumer protection law" and so is prohibited only if it is "specifically preempted" by, and not merely "inconsistent with," any provision of the Cable Act. NCTA argues that the District Court erred because it failed to grasp the ways in which the Cable Act makes

clear that a requirement like that imposed by the Basic Tier Provision is necessarily a "regulation" of "the rates for the provision of cable service" within the meaning of § 543(a)(2) of the Cable Act and so cannot be applied to cable systems subject to effective competition.

NCTA relies heavily in advancing its position on the reasoning in the D.C. Circuit's decision in Time Warner Entertainment Co. v. FCC, 56 F.3d 151 (D.C. Cir. 1995). There, the D.C. Circuit addressed § 543(b)(8)(A),[6] a distinct provision of the Cable Act, which likewise imposes requirements on cable system operators in connection with the basic tier. Id. at 192.

In doing so, the court noted the "close relationship" between § 543(b)(8)(A) and § 543(b)(7), which lays out the "[c]omponents of [the] basic tier subject to rate regulation" and in which one can find § 543(b)(7)(A)(ii), the mandate to carry PEG channels on the basic tier. Id. Then, based on a separate subsection of § 543(b)(7) that "clearly states an intention directly to regulate rates," the D.C. Circuit concluded that Congress intended for § 543(b)(7) (and § 543(b)(8)(A) along with

---

[6] Section 543(b)(8)(A) provides in part that: "A cable operator may not require the subscription to any tier other than the basic service tier required by [§ 543(b)(7)] as a condition of access to video programming offered on a per channel or per program basis. . . ."

it) to apply to only systems not subject to effective competition. Id.

We do not see how Time Warner's discussion of § 543(b)(7) helps NCTA's preemption claim regarding the Basic Tier Provision. Time Warner's reasoning confirms that § 543(b)(7)(A)(ii) does not itself impose requirements with respect to the components of the basic tier on cable system operators in systems subject to effective competition, but it does not address whether states or franchising authorities have independent authority to impose identical requirements on such systems. It thus does not hold -- or even suggest -- that those entities are specifically preempted from doing so by either § 543(a)(2) or § 543(b)(7), or the two together.

That said, we do not dispute a necessary premise of NCTA's argument -- that the mandate to carry PEG channels on the basic tier set forth in § 543(b)(7)(A)(ii) constitutes the "regulation" of "rates" within the meaning of § 543(a)(2). Section 543(b)(7)(A)(ii) is contained in a section of the Cable Act entitled "[r]egulation of rates" and a subsection entitled "[c]omponents of [the] basic tier subject to rate regulation." 47 U.S.C. § 543. The Cable Act also makes clear that "the basic service tier" referenced in § 543 plays an integral role in the statute's rate regulation scheme -- as does Time Warner, for that matter. See id. § 543(b)(1); Time Warner, 56 F.3d at 192.

But, even with that premise in place, the mandate imposed by the Basic Tier Provision differs in a key respect from the one set forth in § 543(b)(7)(A)(ii): It applies only to cable systems that are not rate regulated, as it applies only to cable systems in Maine, all of which are subject to effective competition. The Basic Tier Provision thus no more "regulat[es]" the "rate[] for the provision of cable service" within the meaning of the Cable Act than any requirement that might be imposed on the operator of a cable system that is not rate regulated. Indeed, the provision is entirely unrelated to rates, and the operators subject to it are free to account for the requirement it imposes by setting the price for the cable service that they provide on their systems as they see fit.

Accordingly, at least in the absence of a contrary interpretation from the FCC,[7] we reject NCTA's argument that the Basic Tier Provision is "specifically preempted" by § 543 of the Cable Act, because we reject its assertion that it is of no significance that the mandate to carry PEG channels that the Basic Tier Provision includes applies only to cable systems for which the rates are not regulated. And, given our reasons for rejecting that argument, we must also reject the contention -- insofar as

_____

[7] On January 15, 2021, the panel sent a letter to the FCC soliciting the agency's views on questions raised in this case. On March 16, 2021, the FCC declined to file an amicus brief.

NCTA means to make it -- that the Basic Tier Provision is facially preempted by the Cable Act provisions at issue, even if the Basic Tier Provision is not a "consumer protection law," 47 U.S.C. § 552(d)(1), and so need only be "inconsistent with" those provisions, id. § 556(c), to be preempted.

**B.**

We next consider NCTA's claim of facial preemption regarding the HD Provision. NCTA identifies the preemptive provision here as § 544(e) of the Cable Act, which provides that the FCC "shall prescribe regulations which establish minimum technical standards relating to cable systems' technical operation and signal quality." Id. § 544(e). We once again reject NCTA's contention.

NCTA first argues that § 544(e), by directing the FCC to promulgate regulations establishing "minimum technical standards relating to . . . signal quality," must be understood to prohibit states and franchising authorities from imposing such standards if they are more onerous for operators to comply with than those that the FCC itself requires. Thus, NCTA contends, because the HD Provision imposes just such a standard, § 544(e) facially preempts it.

The District Court rejected that contention on the ground that the HD Provision was, like the Basic Tier Provision, a "consumer protection law" under § 552(d)(1), and so could be

- 25 -

preempted only under the heightened "specifically preempted" standard. NCTA, 451 F. Supp. 3d at 142, 145. It then held that the heightened standard was not met because, even "[a]ssuming HD technology is a 'signal quality' issue," nothing in § 544(e) purports to restrict what states may do when it comes to setting the relevant types of "minimum technical standards," as it merely provides the authority that the FCC itself possesses to establish them. Id. at 144.

Indeed, § 544(e) itself specifies that "[n]o State or franchising authority may prohibit, condition, or restrict a cable system's use of any type of subscriber equipment or any transmission technology," 47 U.S.C. § 544(e),[8] which the District Court concluded shows that "Congress . . . knows how to restrict state authority" when it wishes to do so, NCTA, 451 F. Supp. 3d at 144. Thus, the District Court concluded that, because § 544(e) does not identify "signal quality" "in the list of things a state cannot 'prohibit, condition, or restrict,'" it does not "specifically preempt" the HD Provision, even assuming that the HD Provision sets a minimum technical standard for signal quality. Id. (quoting 47 U.S.C. § 544(e)).

---

[8] Below, NCTA also argued that the HD Provision is a "prohibit[ion], condition, or restrict[ion] [on] a cable system's use of . . . any transmission technology," 47 U.S.C. § 544(e), but has abandoned that argument on appeal.

- 26 -

We agree. Section 544(e) speaks expressly in the relevant respect only to the authority that the FCC does have. It says not a word about any authority that any other actor is barred from exercising. The express prohibition against other types of state regulation in § 544(e) reinforces the conclusion that this provision of the Cable Act does not "specifically preempt[]" the HD Provision.

There is also another reason, however, that we must reject NCTA's claim of specific preemption. The District Court expressly pointed out that the FCC's "technical standards on signal quality seem to be set forth in 47 C.F.R. § 76.605" but that the "highly technical standards contained therein are not understandable without expert assistance." NCTA, 451 F. Supp. 3d at 144 n.22. That is significant because NCTA has made no argument to us regarding what those regulations might indicate in the relevant respect. Nor, we add, has NCTA pointed us on appeal to an FCC interpretation of what constitutes a "technical standard" under § 544(e).

NCTA does cite to an FCC order, Technical and Operational Requirements of Part 76 Cable Television, 50 Fed. Reg. 52,462-02 (Dec. 24, 1985), which it asserts describes "'signal quality' standards . . . [as] including 'high definition or quasi-high definition techniques.'" But, that passing reference does not constitute a developed argument as to what a "minimum technical

standard[] relating to . . . signal quality" is under the relevant provision of the Cable Act that is said to be preemptive of the HD Provision, let alone why, given that understanding of "minimum technical standards," the HD Provision must be understood to impose one.

It is true that the order that NCTA cites evinces the FCC's concern that variable "technical standards" might frustrate innovation, including by undermining "efforts [that were being] made to improve the quality and fidelity of television through high definition or quasi-high definition techniques."  Technical and Operational Requirements of Part 76 Cable Television, 50 Fed. Reg. at 52,465.  But, NCTA does not argue that the HD Provision does more than require operators to deliver to subscribers PEG content "in a quality and format equivalent to the quality and format of local broadcast channel signals . . . if provided as such by the originator."  Me. Rev. Stat. Ann. tit. 30-A, § 3010(5-B).  And NCTA does not explain how -- and instead merely asserts that -- such a contingent requirement sets a "minimum technical standard[] relating to . . . signal quality" within the meaning of § 544(e).  47 U.S.C. § 544(e) (emphasis added).

NCTA also points in its opening brief to us to a House Conference Report describing § 534(b)(4)(B) of the Cable Act.  NCTA argues that the report "makes clear that high definition is a 'standard[] for . . . television signals.'"  (alterations in

original). That report describes "the authorization of broadcast high definition television" as a "standard[] for broadcast television signals." H.R. Rep. No. 102-862, at 67 (1992) (Conf. Rep.), as reprinted in 1992 U.S.C.C.A.N. 1231, 1249. But, this generic reference to a "standard" does not suffice to show that the HD Provision sets a "minimum technical standard[]" within the meaning of § 544(e), such that the HD Provision could be said to be preempted on that basis.

NCTA separately contends in its reply brief (and noted at oral argument) that in order to comply with the HD Provision in some cases, a cable operator might be required to upgrade the equipment used to transmit PEG content from a PEG facility to the operator's headend. But, the HD Provision does not on its face require operators to provide equipment of any particular quality to PEG stations -- any obligation on that score appears to derive from individual franchise agreements rather than from the HD Provision. The fact that the HD Provision may, because of its interaction with the terms of an individual franchise agreement, indirectly create new technological obligations for a cable system operator does not mean that the provision itself sets a "minimum technical standard[]" for purposes of § 544(e).

Thus, NCTA's failure to explain how the HD Provision, even if it imposes a requirement "relating to . . . signal quality," establishes a "minimum technical standard[] relating

to . . . signal quality," 47 U.S.C. § 544(e) (emphasis added), provides an additional reason why we cannot say, at least on this record and based on the arguments made to us, that NCTA has met its burden to show that the HD Provision is specifically preempted by § 544(e). Moreover, this same failure necessarily precludes us from concluding that the HD Provision is preempted by § 544(e) under the less demanding "inconsistent with" standard, insofar as NCTA means to be making that alternative argument. And, that being so, NCTA's claim of facial preemption fails even if the HD Provision does not qualify as a "consumer protection law" and thus may be preempted even if the heightened "specifically preempted" standard is not met.[9]

## C.

We turn next to NCTA's facial preemption claim regarding the Electronic Program Guide Provision. NCTA contends that this provision is preempted even if it is a "consumer protection law"

---

[9] Insofar as NCTA means to argue that any state-law measure regulating signal quality in any way is "inconsistent with" § 544(e), notwithstanding that this provision of the Cable Act speaks only to "minimum technical standards relating to . . . signal quality," 47 U.S.C. § 544(e) (emphasis added), we reject it, because NCTA develops no argument for ignoring the words "minimum technical standards." We note further that because NCTA fails to meet its burden to show that the HD Provision sets forth a minimum technical standard for signal quality, we need not address the parties' dispute over whether the District Court should have accepted additional evidence regarding whether the minimum technical standard purportedly set forth in the HD Provision actually conflicts with those set by the FCC.

- 30 -

under § 552(d)(1), as the District Court held it was, see NCTA, 451 F. Supp. 3d at 145, because it, too, is "specifically preempted," 47 U.S.C. § 552(d)(1).  The alleged culprits in the Cable Act this time are § 544(b)(1), which addresses "requirements for . . . information services"; and § 544(f)(1), which addresses "requirements regarding the . . . content of cable services."  We address each argument in turn but find neither persuasive.

**1.**

Section 544(b)(1) specifies that a "franchising authority . . . may establish requirements for facilities and equipment, but may not . . . establish requirements for video programming or other information services."[10]  Id. § 544(b)(1). The phrase "'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service."  Id. § 153(24); see Implementation of Section 621(a)(1) of the Cable Commc'ns Pol'y

---

[10] Section 544(b)(1) allows for exceptions to this prohibition, not relevant here, for certain requirements involving the notices cable operators may be required to provide to subscribers.  See 47 U.S.C. § 544(b)(1), (h).

Act of 1984 (Third Report and Order), 34 FCC Rcd. 6844, 6884 (2019).

NCTA argues that the electronic program guide "fits this definition" of information service "hand in glove" because "[i]t does all of the above: 'mak[es] available information' about programming by 'generating, acquiring, [and] storing' data about past, current, and upcoming programming, and 'transform[s], process[es], retriev[es], [and] utilize[es]' that data by converting and displaying it in a customer-usable format that enables navigation between channels, as well as program recording." (first alteration added). NCTA then reads § 544(b)(1) of the Cable Act, by clear implication, to oust the State from imposing such a requirement.

The District Court rejected that argument without reaching the question of whether an "electronic program guide" within the meaning of the provision of the Maine Act at issue is an "information service." See NCTA, 451 F. Supp. 3d at 145-46. It held that the Electronic Program Guide Provision is a "consumer protection law" under § 552(d)(1) of the Cable Act, and that, even assuming that the electronic program guides to which that PEG provision applies qualify as "information services" within the meaning of § 544(b)(1), Maine "is imposing the electronic programming guide requirement directly on cable operators and is not acting as a franchising authority." Id. at 146. Thus, the

District Court held that the Electronic Program Guide Provision was not "specifically preempted" by § 544(b)(1), because that provision of the Cable Act "applies only to franchising authorities, not states." Id.

But, even if we were to reject the District Court's reasoning, there is an independent basis manifest in the record for affirming the District Court's ruling. See O'Brien v. Town of Agawam, 350 F.3d 279, 292 (1st Cir. 2003) ("[T]his [C]ourt may affirm on any alternative basis that is manifest in the record."). That reason has to do with whether the Electronic Program Guide Provision takes aim at an "information service."

The FCC has explained that the definition of an "information service" under the Cable Act "rests on the function that is made available . . . to its end users." Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities, 17 FCC Rcd. 4798, 4821 (2002), aff'd in part, Brand X Internet Servs. v. FCC, 435 F.3d 1053, 1053 (9th Cir. 2006) (affirming declaratory ruling in accordance with Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005)). The statute itself provides that an "information service" is not merely something that "generat[es], acquir[es], stor[es], transform[s], process[es], retriev[es], utiliz[es], or mak[es] available information via telecommunications" in its own right but something that "offer[s] . . . a capability for" doing those things. 47

- 33 -

U.S.C. § 153(24); see also Fed.-State Joint Bd. on Universal Serv., 13 FCC Rcd. 11,830, 1998 WL 166178, at *25 (Apr. 10, 1998) (explaining that whether a service "should be classed as providing information services rather than telecommunications services" turns on whether it "merely offer[s] transmission . . . or whether [it] go[es] beyond the provision of a transparent transmission path to offer end users the 'capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information'" (emphasis added) (quoting 47 U.S.C. § 153(24))).[11]

NCTA has argued to us, however, only that an "electronic programming guide fits [the] definition [of an information service] hand in glove" because such a guide itself generates, acquires, stores, transforms, processes, retrieves, utilizes, and makes available information. It is unclear from that assertion whether any electronic program guide covered by this PEG provision

---

[11] For example, when the FCC evaluated whether two forms of texting are information services or telecommunications services, it found that they were information services since they "involve the capability for 'acquiring' and 'utilizing' information." Petitions for Declaratory Ruling on Regul. Status of Wireless Messaging Serv., 33 FCC Rcd. 12,075, 12,084 (2018). It did not reach that conclusion on the ground that the messaging services themselves acquire or utilize information but rather because, using those services, "a wireless subscriber can 'ask for and receive content, such as weather, sports, or stock information, from a third party that has stored that information on its servers.'" Id.

- 34 -

-- let alone all of them -- allows users to "stor[e] . . . information" by providing recording capabilities or to "acquir[e] . . . information," and therefore is an information service. 47 U.S.C. § 153(24). Yet, NCTA has not argued at any point to us that electronic program guides -- at least insofar as they are ones within the scope of the PEG provision at issue -- offer cable subscribers the capability of doing those things, nor does the record establish as much.[12]

NCTA bears the burden to establish on this facial preemption challenge that "no set of circumstances exists under which the [statute] would be valid." Pharm. Rsch. & Mfrs. of Am. v. Concannon, 249 F.3d 66, 77 (1st Cir. 2001) (quoting Salerno, 481 U.S. at 745); see also Thayer v. City of Worcester, 755 F.3d 60, 71 n.3 (1st Cir. 2014) (explaining that outside of First Amendment overbreadth challenges, a plaintiff bringing a facial challenge "in other, non-speech-related contexts" must meet the

_____

[12] In affidavits NCTA submitted in support of its motion for a preliminary injunction, cable executives merely describe electronic program guides as "digital displays that identify what channel is at a particular location and what programming is or will be shown on that channel," even though an electronic program guide that simply displays the details of what is currently playing and what is upcoming on the various available channels would seem to do nothing "more than merely transmit 'information of the user's choosing, without change in the form or content of the information'" and thus be better classified as a telecommunications service. See Petitions for Declaratory Ruling, 33 FCC Rcd. at 12,088; see also id. at 12,076 (explaining that "telecommunications services" and "information services" are "mutually exclusive" under the Cable Act).

Salerno standard (citing 481 U.S. at 745)), vacated on other grounds, 576 U.S. 1048 (2015); MetroPCS Cal., LLC v. Picker, 970 F.3d 1106, 1122 (9th Cir. 2020). Its failure to show that the PEG provision at issue encompasses only those electronic program guides that qualify as "information services" under § 544(b)(1) requires that we reject its contention that § 544(b)(1) facially preempts this PEG provision.

**2.**

We turn, then, to NCTA's claim that the Electronic Program Guide Provision is facially preempted by § 544(f)(1), which provides that "[a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided" by the Act. 47 U.S.C. § 544(f)(1). The Act elsewhere defines "cable service" to include "the one-way transmission to subscribers" of "information that a cable operator makes available to all subscribers generally." Id. § 522(6), (14). NCTA contends that, given that definition, the Electronic Program Guide Provision represents an effort by Maine to "impose [a] requirement[] regarding the . . . content of cable services" within the meaning of § 544(f)(1), and that this PEG provision is therefore "specifically preempted," id. § 552(d)(1).

The District Court recognized that the Cable Act bars "government regulation of content," but it rejected NCTA's

contention on this score because it held that "PEG channels are an exception" to that "general concern." NCTA, 451 F. Supp. 3d at 145. The District Court explained that when it comes to PEG channels, "cable operators have no editorial control . . . and it is the franchising authority that has editorial control over content." Id. Accordingly, the District Court concluded that "requiring cable operators to allow PEG channels access to the programming guide does not specifically conflict with § 544(f)." Id. at 146.

In arguing for preemption nonetheless, NCTA contends that the Electronic Program Guide Provision is a "requirement[] regarding the . . . content of cable services" under § 544(f)(1) because it "directs the content of PEG listings in electronic programming guides." To make that case, NCTA points out that, prior to the Maine Act's passage, "NCTA members already list[ed] PEG channels in their electronic program guides, and customers already ha[d] the ability to navigate to those channels via the guides," and that its "members have not typically included for each locality detailed PEG programming information, such as the content and duration of a municipality meeting or a town's high-school football game." The Maine Act, NCTA argues, "directs the[] content" of electronic program guides because it "requires cable operators to replace existing content in the electronic program guides that reads 'LOCAL' . . . with more detailed content

labeling and describing the event, for example 'high school football game,' that is being transmitted to a particular locality."

Thus, NCTA premises this preemption claim on the understanding that the Electronic Program Guide Provision requires the inclusion of detailed programming data -- and not just the "listing" of PEG channels -- on electronic program guides. But, given that NCTA's preemption claim relies on that broader understanding of the scope of the Electronic Program Guide Provision, we do not find it to be persuasive, albeit for reasons that are different from those relied upon by the District Court.

Our concern stems in part from the language of the Electronic Program Guide Provision, which specifies that:

> A cable system operator, when requested, shall assist in providing the originator with access to the entity that controls the cable television service's electronic program guide so that subscribers may view, select and record [PEG] access channels in the same manner as that in which they view, select and record local broadcast channels. In addition, a cable system operator shall identify [PEG] access channels on the electronic program guide in the same manner as that in which local broadcast channels are identified. This subsection does not obligate a cable system operator to list [PEG] access channel content on channel cards and channel listings. If channels are selected by a viewer through a menu system, the cable system operator shall display the [PEG] access channels' designations in a similar manner as that in which local broadcast channel designations are displayed.

Me. Rev. Stat. Ann. tit. 30-A, § 3010(5-B). It is not at all evident from that text that it is necessary to provide the programming details that NCTA objects to providing to ensure that a cable system operator "identif[ies] [PEG] access channels . . . in the same manner as that in which local broadcast channels are identified."

We find it significant, too, that even though NCTA asserts that its members cannot comply with the Electronic Program Guide Provision because "PEG programmers generally do not provide the information needed to populate the program guides," Maine contends that the provision requires cable system operators to "include[]" "program details" only "provided that PEG operators supply the necessary information." And, while NCTA has asserted that its members would "incur hundreds of thousands of dollars in engineering costs to ensure" that their electronic program guides are compliant with the Maine Act, NCTA's only response to Maine's assertion that it has "offer[red] no good explanation for why at least the names of PEG channels cannot be listed on electronic programming guides" is to insist that this "is emphatically not what the Maine Act requires."

Thus, from all that we can tell, NCTA is asking us to address a concern arising from § 544(f)(1) of the Cable Act that would appear to exist only if we were to adopt the broader construction of the Electronic Program Guide Provision that we are

not persuaded its text compels, that NCTA has not attempted to show must be adopted even though the text does not compel it, and that raises issues of construction and evidence over which there appears to be much uncertainty. Moreover, the state-law provision at issue is one which the Maine Law Court has not construed, and NCTA has not sought to certify the question concerning the scope of that provision to the Maine Law Court. In such circumstances, we decline to interpret this state-law measure to give rise to the specific preemption concern about having to provide programming details that NCTA identifies, given that the concern may well be a hypothetical one. See also Wawenock, LLC v. Dep't of Transp., 187 A.3d 609, 612 (Me. 2018) (explaining that, under Maine law, courts interpret statutes "according to [their] unambiguous language, 'unless the result is illogical or absurd'" (quoting MaineToday Media, Inc. v. State, 82 A.3d 104, 108 (Me. 2013))).[13]

---

[13] The Attorney General's brief on behalf of Maine does state at one point that the Electronic Program Guide Provision "requir[es] that PEG stations be identified by name and that programming information be included." (emphasis added). But, Supreme Court "precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities,'" Stenberg v. Carhart, 530 U.S. 914, 940 (2000) (quoting Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 395 (1988)), as is the case in Maine, see Auburn Sav. Bank v. Campbell, 273 A.2d 846, 847 (Me. 1971). And we are particularly disinclined to defer here, as the Attorney General's construction enlarges, rather than diminishes, the scope of private parties' liability, see Stenberg, 530 U.S. at 1005 n.17 (Thomas, J., dissenting), and because the Attorney General has no particular regulatory expertise over cable companies.

Moreover, NCTA develops no fallback argument that, absent the broader construction of the Electronic Program Guide Provision just addressed, that provision still imposes a "requirement[] regarding . . . content" within the meaning of § 544(f)(1). We thus have before us no "developed argumentation" for finding the provision preempted even on that narrower understanding of its scope, and so we do not address whether it would be. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Accordingly, we cannot conclude that NCTA has met its burden of establishing that the Electronic Program Guide Provision is a "specifically preempted," 47 U.S.C. § 552(d)(1), "requirement[] regarding the . . . content of cable services," id. § 544(f)(1). And the same reasoning that supports that conclusion also requires that we reject any argument that NCTA means to make that the Electronic Program Guide Provision is "inconsistent with" § 544(f)(1) within the meaning of § 556(c).

## IV.

There remains NCTA's contentions that the Basic Tier, HD, and Electronic Program Guide Provisions are facially preempted because all three are "inconsistent with" § 541(a)(4)(B) and § 531 and so are preempted by the Cable Act on that basis. NCTA also makes this same argument about the preemptive effect of those provisions of the Cable Act as to the remaining challenged PEG

- 41 -

provision in the Maine Act that we have not yet addressed -- the Channel Placement Provision. But, reviewing de novo, see Bower, 731 F.3d at 92, we are not persuaded that any of these PEG provisions is facially preempted by either of these Cable Act provisions.[14]

## A.

Section 541(a)(4)(B) of the Cable Act authorizes a franchising authority to "require adequate assurance that the cable operator will provide adequate [PEG] access channel capacity, facilities, or financial support." 47 U.S.C. § 541(a)(4)(B). NCTA contends that this provision bars states and franchising authorities from imposing requirements that exceed what is "adequate," which it notes the FCC has defined as "satisfactory or sufficient." See Third Report and Order, 34 FCC Rcd. at 6869. NCTA then contends that the four PEG provisions before us are "inconsistent with" § 541 because they require more than what is "adequate" and that they are therefore facially preempted. That is so, according to NCTA, because they, respectively, "mandate[] placement in particular channel positions next to broadcast channels on the basic tier, signal quality in both HD and SD, with channels dedicated to each, and display in

---

[14] Insofar as NCTA argues in its reply brief that the PEG provisions are not only "inconsistent with" § 531 and § 541(a)(4)(B) but also "specifically preempted" by the same, our resolution of the former claim also disposes of the latter.

the same manner as broadcast channels in electronic program guides," and so require "more than" "what is 'satisfactory' or 'sufficient' for cable subscribers to access and receive PEG channels." Or, as NCTA puts it in its reply brief, the requirements that the PEG provisions impose "by definition exceed[] what is meant by 'adequate,'" as the Maine Act seeks "to put PEG channels on equal footing with broadcast stations."[15]

The District Court rejected NCTA's argument on grounds that by now should be familiar. It concluded that each of the PEG provisions is a "consumer protection law" and that "[i]n enacting" them, "the State [was] not acting as the franchising authority or dictating the terms of the franchise agreement." NCTA, 451 F. Supp. 3d at 139. Thus, the District Court held that § 541 is "not applicable here," because § 541 "address[es] only what a franchising authority may or may not do," and so there is no basis for concluding that any of these PEG provisions is "specifically preempted" by § 541, given § 541's focus on what franchising authorities may do through the franchising process rather than on what states may do through legislation. Id.

---

[15] We note that it is not entirely clear that the PEG provisions fall within the preemptive scope of § 541(a)(4)(B), as that provision refers only to requirements regarding "channel capacity, facilities, or financial support," and NCTA has not explained why the PEG provisions are within that ambit.

- 43 -

NCTA contends that this reasoning "misses the point" of the Cable Act's preemption scheme and that the District Court should have concluded that "Maine is not permitted to do what a franchising authority is prohibited from doing." But, even if we assume as much, we still must reject NCTA's claim of facial preemption, due to the limited nature of its argument about what is "adequate" within the meaning of § 541(a)(4)(B). See O'Brien, 350 F.3d at 292.

NCTA's sole contention on that score is that requirements comparable to those imposed on broadcast channels exceed what is adequate in every case.[16] In connection with that argument, as we have noted, NCTA observes that the FCC has defined "adequate" according to its "ordinary meaning" of "satisfactory or sufficient," and it then cites to an FCC order for the proposition that "[t]he FCC has explained that the limits on 'adequate' PEG facilities, equipment, and support are non-waivable federal restrictions on what states and localities may demand." See Third Report and Order, 34 FCC Rcd. at 6869-70.

---

[16] Although NCTA does assert in its reply brief that "[h]igh definition is not 'standard,' . . . standard definition is standard, and it is adequate" and that "special accommodations to generate hyper-local data for display on electronic programming guides are not 'adequate'" because "that requires more than any other content provider receives," it does not make these points in its opening brief. See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").

- 44 -

But, NCTA does not address the fact that in that order the FCC rejected an "invitation by cable operators to establish fixed rules as to what constitutes 'adequate'" PEG resources and explained that the proper inquiry looks to what is "necessary to further the goals of the Cable Act." Id. at 6870.  Nor does NCTA address the fact that the FCC elaborated on that point in that same order by explaining that "[i]n general," a number of "factors [are] relevant" to the determination of "what constitutes 'adequate,'" which "might vary depending on, among other things, the number of subscribers within a franchise, the area covered by a franchise, the number of cable operators within a franchise, the area's population and geography, the cable-related community needs and interests, and whether PEG channel capacity is substantially used." Id.

That NCTA does not address those points presents a problem for its facial preemption claim, because NCTA does not either explain why those factors in that order are not relevant to the "adequate" constraint or address how they bear on this case. In addition, NCTA does not contend with the evidence in the record about the experiences of communities in Maine and what the State's residents need to be able to access PEG channels.  We thus cannot conclude that NCTA has carried its burden to show facial preemption based on § 541 of the Cable Act as to any of the four PEG provisions

- 45 -

in question. See Zannino, 895 F.2d at 17. Accordingly, we must reject this claimed basis for finding facial preemption.

## B.

We turn now to NCTA's argument that all four PEG provisions are facially preempted because each is "inconsistent with" § 531 of the Cable Act. The argument runs as follows.

Section 531(a) of the Cable Act provides that "[a] franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for [PEG] use only to the extent provided in this section." 47 U.S.C. § 531(a). NCTA reads this provision broadly, by paraphrasing it to state that "PEG may only be regulated 'to the extent provided' in [§] 531." NCTA then argues that § 531 does not affirmatively authorize any of the four PEG provisions of the Maine Act, and that, in consequence, each is "inconsistent with" § 531.

Maine's initial line of defense is that none of the PEG provisions is "inconsistent with" § 531 precisely because each is state imposed, while § 531 by its terms addresses only requirements imposed by franchising authorities. The District Court relied on similar reasoning in ruling for Maine, albeit while evaluating only whether the PEG provisions are "specifically preempted" by § 531 and not merely whether they are "inconsistent with" the same, see NCTA, 451 F. Supp. 3d at 139, given its conclusion that all four PEG provisions are "consumer protection laws," id. at 140,

142, 145. But, once again, the District Court's non-preemption ruling must be affirmed, even if we assume that its underlying reasoning is mistaken, as NCTA contends. See O'Brien, 350 F.3d at 292.

As noted above, NCTA describes § 531(a) of the Cable Act as providing that "PEG may only be regulated 'to the extent provided' in [§] 531." But, that summary of the legislative text is too summary. In full, § 531(a) specifies that "[a] franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for [PEG] use only to the extent provided in this section." 47 U.S.C. § 531(a) (emphasis added). Absent some contrary interpretation by the FCC or some argument for doing so, neither of which NCTA has supplied, we see no reason to read "the designation or use of channel capacity for" out of the statute. See Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1058 (2019).

We are thus left with two questions for each PEG provision: (1) whether it is within the scope of § 531(a), defined to limit at most the imposition of requirements on cable system operators that are "with respect to the designation or use of channel capacity for [PEG] use," 47 U.S.C. § 531(a); and (2) if so, whether that PEG provision is indeed authorized somewhere in § 531. But, as to the first question, because NCTA assumes that the subsection limits all requirements related to PEG channels,

- 47 -

notwithstanding the superfluity problem that results from such a reading, it offers no explanation of how at least three of the four PEG provisions -- the Basic Tier Provision, the Channel Placement Provision, and the Electronic Program Guide Provision -- do relate to "the designation or use of channel capacity." See Zannino, 895 F.2d at 17.

That said, it is possible to glean from NCTA's brief the argument that at least the HD Provision may relate to "the designation . . . of channel capacity." NCTA notes in its statement of the case, for example, that delivering content in HD "requires more than four times the cable-system bandwidth" than delivering content in SD does, and it also cites to an affidavit that further explains that under the HD Provision operators would be required to "dedicat[e] more . . . channel capacity to transmit PEG channels in both SD and HD."

But, even if we were to read NCTA to be making such an argument about how the HD Provision is encompassed by § 531(a) of the Cable Act, we would then confront the second question in the § 531 inquiry described above. And, if the HD Provision falls within § 531(a) on the ground that it is a "requirement[] . . . with respect to the designation . . . of channel capacity for [PEG] use" because it requires the designation of incremental channel capacity, it is hardly evident that the HD Provision would not then be authorized affirmatively by § 531(b), which empowers a

franchising authority to "require . . . that channel capacity be designated for [PEG] use." 47 U.S.C. § 531(b). True, not all requirements "with respect to the designation . . . of channel capacity" must themselves actually require the designation of channel capacity, such that they fall within the scope of § 531(b). But, NCTA's arguments as to why the HD Provision is encompassed within § 531(a), to the extent that it has made them, also would require the conclusion that the HD Provision is authorized by § 531(b) on the ground that it does not merely relate to such "designation" but in fact requires a designation in its own right. Nor does NCTA develop any argument to the contrary. Thus, given that NCTA bears the burden to establish preemption, its claim of facial preemption based on § 531 as to the four PEG Provisions also fails, not only as to the Basic Tier, Channel Placement, and Electronic Program Guide Provisions, but also as to the HD Provision.

## V.

For the foregoing reasons, we **affirm** the decision of the District Court. The parties shall bear their own costs.